UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JAMES B. HARGETT, *by his Guardian Kathy Humphries*, )<br>    *Plaintiff*, )<br> )<br>    *vs.* )<br> )<br>CORRECTIONAL MEDICAL SERVICES, INC., *et al.*, )<br>    *Defendants.* ) | 1:11-cv-1316-JMS-DKL |

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Presently pending before the Court is Defendants Correctional Medical Services, Inc. ("CMS") and Dr. Michael Mitcheff's (collectively, "Defendants") Motion for Summary Judgment.[1] [Filing No. 150.] It is undisputed that in August 2009, while he was incarcerated at the Pendleton Correctional Facility, Plaintiff James B. Hargett[2] suffered an embolic stroke caused by aortic valve vegetation from endocarditis. [Filing No. 152-2 at 3.] The sufficiency of Defendants' medical care before and after that stroke is the subject of this litigation. For the following reasons, the Court grants summary judgment in favor of the remaining Defendants on Mr. Hargett's remaining claims.

### I.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes

---

[1] Mr. Hargett has settled his claims against Dr. Charles Zimont and Dr. Daniel S. Mihalo, and those defendants have been dismissed with prejudice from this litigation. [Filing No. 202.]

[2] Mr. Hargett's claims are being pursued by his legal guardian, Kathy Humphries. For clarity, the Court will still refer to the Plaintiff as Mr. Hargett.

clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898.

Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

## II.
### RELEVANT BACKGROUND

The following facts are undisputed, unless otherwise noted. CMS is a company that contracts with the Indiana Department of Correction ("DOC") to provide medical care at various prisons throughout Indiana. [Filing No. 152-2 at 2.] Dr. Mitcheff is the Regional Medical Director ("RMD") for CMS. [Filing No. 152-2 at 2.]

In June 2000, Mr. Hargett began serving a thirty-year sentence for armed robbery. [Filing No. 152-2 at 3.] In February 2006, he had cardiac surgery to replace an aortic valve. [Filing No. 61 at 3; Filing No. 152-2 at 3; Filing No. 152-3 at 1.] Mr. Hargett was incarcerated at the Wabash Valley Correctional Facility until he was transferred to the Pendleton Correctional Facility in March 2009. [Filing No. 152-2 at 3.]

In August 2009, Mr. Hargett suffered an embolic stroke at the age of 43, caused by aortic valve vegetation from endocarditis. [Filing No. 152-15 at 6-7.] This type of stroke is not the type of stroke that Plavix is designed to prevent. [Filing No. 163 at 8 (acknowledging "as true" statements including that an anticoagulant like Plavix would not have reduced the size of a bacterial embolus or prevented an embolic stroke).]

Instead, Mr. Hargett asserts that by failing to renew his Plavix prescription, Defendants caused him to experience symptoms of gastroesophageal reflux disease ("GERD"), which allegedly masked his stroke symptoms. [Filing No. 161 at 2 ("The Defendants do not mention that by taking Mr. Hargett off Plavix and placing him on aspirin, they caused the GERD.").]

## A. Pre-Stroke Care

On May 6, 2007, Mr. Hargett experienced chest pressure, nausea, and vomiting and was ultimately transferred to Wishard Memorial Hospital ("WMH"). [Filing No. 152-15 at 23.] He was discharged the following day with hospital notes indicating that his non-specific symptoms were "probably some GERD." [Filing No. 152-15 at 23.]

GERD is an acronym for gastroesophageal reflux disease, which "is a common cause of chest pain which results from reflux of acid from the stomach to the esophagus leading to inflammation of the esophageal lining (esophagitis)."[3] [Filing No. 152-29 at 2.] GERD "can cause symptoms including chest pressure, burning and pain, nausea, vomiting, bleeding, and swallowing difficulties." [Filing No. 152-29 at 2.]

On May 14, 2007, Mr. Hargett was again admitted at WMH. [Filing No. 152-15 at 19.] He was treated with a principal diagnosis of GERD. [Filing No. 152-15 at 20.] Mr. Hargett was discharged with a prescription for 81 mg of aspirin per day, as well as other medications. [Filing No. 152-15 at 20.]

On March 20, 2008, DOC Dr. Leann E. Watson treated Mr. Hargett for chest pain. [Filing No. 152-4 at 17.] Dr. Watson filled out a Non-Formulary Drug Tracking Form recommending Plavix because Mr. Hargett had "failed chest pain management w/ aspirin." [Filing No. 152-4 at 23.] That form was delivered to Dr. Mitcheff, who approved the request. [Filing No. 152-4 at 22-23 (email to Dr. Mitcheff with request and affirmative response with initials "Yes mm.").]

---

[3] This explanation is based on unchallenged testimony from Defendants' expert, Dr. James B. Hermiller.

Dr. Watson saw Mr. Hargett again on May 8, 2008 for a chronic care visit. [Filing No. 152-4 at 25.] Dr. Watson submitted another Non-Formulary Drug Tracking Form for Plavix for Mr. Hargett, [Filing No. 152-5 at 4-5], which Dr. Mitcheff approved, [Filing No. 152-5 at 4].

On May 27, 2008, Mr. Hargett was transferred to WMH for an evaluation of chest pain. [Filing No. 152-15 at 16.] At the time of admission, Mr. Hargett was taking 75 mg Plavix and 81 mg aspirin daily, among other medications. [Filing No. 152-15 at 17.] He was discharged on May 30, 2008, with a diagnosis of chest pain, [Filing No. 152-15 at 14-15], and continued on 81 mg of aspirin and 75 mg of Plavix[4] daily, among other medications, [Filing No. 152-15 at 16].

On August 27, 2008, Mr. Hargett woke up with chest pain at approximately 3 a.m. and was seen by DOC Dr. Alfred Talens. [Filing No. 152-5 at 20.] Mr. Hargett was ultimately transferred to WMH for further treatment, but denied chest pain upon arrival and asked to be released. [Filing No. 152-22 at 2.] The admission records list Plavix and aspirin as some of Mr. Hargett's current medications. [Filing No. 152-22 at 2 (listing Ecotrin[5] and Plavix).]

Mr. Hargett had multiple chronic care visits with DOC doctors during September and October 2008. [Filing No. 152-5 at 22-25; Filing No. 152-6 at 1-11.] He also was evaluated by Dr. Inder Singh at WMH cardiology in October 2008. [Filing No. 152-18 at 8-10.] On December 11, 2008, Dr. Mitcheff approved another Non-Formulary Drug Tracking Form request for Mr. Hargett to receive Plavix. [Filing No. 152-6 at 15-16.]

Between December 12, 2008 and February 13, 2009, Mr. Hargett refused to take his Plavix as prescribed approximately 15 times. [*See* Filing No. 152-14 at 5-22.] The medication refusal forms indicate that Mr. Hargett was informed that continued refusals could result in the

---

[4] His discharge record lists Clopidogrel, which is the generic name for Plavix. [Filing No. 152-15 at 16.]

[5] Ecotrin is an enteric-coated brand of aspirin.

medication being discontinued. [*See* Filing No. 152-14 at 5-22.] At least two of the forms recommend that Mr. Hargett's Plavix prescription be discontinued due to his repeated refusal to take the medication. [Filing No. 152-14 at 20; Filing No. 152-14 at 18.]

Mr. Hargett saw various DOC and non-DOC medical professionals from January to April 2009. [*See, e.g.*, Filing No. 152-6 at 18-25; 152-7 at 1-4; 152-7 at 7-11.] Treatment notes indicate that Mr. Hargett had active prescriptions for 81 mg of aspirin/Ecotrin and 75 mg of Plavix/Clopidogrel. [*See, e.g.*, Filing No. 152-6 at 20 (January 5, 2009); Filing No. 152-6 at 24 (March 2, 2009).] On March 26, 2009, Dr. Mitcheff approved another Non-Formulary Drug Tracking Form request for Mr. Hargett to continue to receive Plavix. [Filing No. 152-7 at 4-5.]

On June 15, 2009, Mr. Hargett was transported to St. Vincent Hospital Anderson ("SVHA") with complaints of chest pain. [Filing No. 152-34 at 3.] He was diagnosed with acute bronchitis, which cardiologist Dr. Singh did not believe was related to his heart. [Filing No. 152-34 at 3.] Mr. Hargett was prescribed an antibiotic. [Filing No. 152-34 at 3.]

Later that night back at the prison, Mr. Hargett was found lying on the floor of a dorm. [Filing No. 152-7 at 19.] He was sweating profusely and had radiating chest pain with tingling in his left arm. [Filing No. 152-7 at 19.] Mr. Hargett was transferred to WMH via ambulance. [Filing No. 152-15 at 13.] Various medical tests were performed, and Mr. Hargett was discharged the following day with orders to follow up with cardiologist Dr. Singh within one month. [Filing No. 152-15 at 13.] The medications on Mr. Hargett's discharge orders included, among other things, "Aspirin, 81 mg PO QAM, Quantity: Prison to dispense and supply meds," and "Clopidogrel[/Plavix], one tablet (75 mg) PO daily indefinite (ASA-intolerance & thrombotic risk reduction)". [Filing No. 165-1 at 4; Filing No. 152-15 at 13.] Mr. Hargett had active pre-

scriptions for aspirin and Plavix at that time.  [Filing No. 165-1 at 1 (listing aspirin and Clopidogrel as active medications).]

On June 18, 2009, DOC Dr. Lorenzo Eli evaluated Mr. Hargett.  [Filing No. 152-7 at 22.] Dr. Eli noted that WMH wanted Mr. Hargett to follow up with cardiology within one month and that he would need approval for that consultation.  [Filing No. 152-7 at 22.]  Mr. Hargett had a chronic care visit with Dr. Lorenzo on June 22, 2009, and Dr. Eli again noted that WMH recommended cardiology follow up.  [Filing No. 152-7 at 24.]  The treatment notes list Mr. Hargett's prescriptions as 75 mg/day of Plavix and 81 mg/day of aspirin/Ecotrin.  [Filing No. 152-7 at 25; Filing No. 152-8 at 1.]  That same day, Dr. Lorenzo submitted a Non-Formulary Drug Tracking Form by email to "RMD Review" for Mr. Hargett to continue to receive 75 mg Plavix for 90 days as "recommended by cardiologist."  [Filing No. 169-1 at 1-2.]  Emails indicate that Dr. Michael Person responded "on behalf of RMD Review" and ultimately approved only aspirin instead of Plavix.  [Filing No. 169-1 at 1.]

Between June 24, 2009 and July 6, 2009, Carrie Welder faxed WMH multiple times to request a cardiology appointment for Mr. Hargett.[6]  [Filing No. 152-8 at 2-4.]  WMH scheduled a cardiology consult for Mr. Hargett for August 17, 2009.  [Filing No. 152-8 at 4.]  Mr. Hargett did not attend that appointment, although the parties dispute why.  Defendants contend that WMH cancelled the appointment and rescheduled it for September 21, 2009.  [Filing No. 151 at 8-9.]  In support of that contention, they cite Ms. Welder's affidavit and corresponding materials, the admissibility of which Mr. Hargett challenges.  [Filing No. 151 at 8-9; Filing No. 167.]  Mr. Hargett challenges Defendants' reliance on Ms. Welder's affidavit because she has never been

---

[6] Mr. Hargett has filed a Motion to Strike an affidavit from Ms. Welder and certain documents attached to that affidavit.  [Filing No. 167 (requesting to strike Filing No. 152-31).]  The Court has not considered those materials in detailing the undisputed facts or in ruling on summary judgment; thus, that motion is denied as moot.  [Filing No. 167.]

listed as a witness on Defendants' witness lists.  [Filing No. 167 at 1.]  Mr. Hargett also contends that "no records have ever been discovered or disclosed to suggest that the appointment had been cancelled by [WMH]" until Ms. Welder's affidavit and corresponding evidence was disclosed at an expert deposition in December 2013.  [Filing No. 167 at 3.]

On July 29, 2009, Mr. Hargett filled out a Request for Health Care form, stating, "I am completely out of my Plavix, HCTZ, Zocor, Enalapril, Vasotec, Norvasc.  And I need a new bottle of Nitro."  [Filing No. 165-2 at 1.]  A note from a member of the health care staff indicates, "Refer to MD.  Ø refills remain."  [Filing No. 165-2 at 1.]

On August 11, 2009, Mr. Hargett submitted a Request for Health Care form, stating,

I am a CHRONIC CARE HEART PATIENT.  I HAVE NOT HAD MY PLAVIX, Norvaasc, Vasotec, HCTZ or Zocor in over 13 DAYS.  I received a request back on 7/29 saying they were being ordered, but have not received any of THESE.  I need to see the Doctor because these meds are ordered through my cardiologist.

[Filing No. 165-3 at 1 (original emphases).]  Below that request is a note on August 11, 2009, stating "Meds have been renewed.  RMD did not approve the Plavix was started on aspirin regimen."  [Filing No. 165-3 at 1.]  The parties dispute who ultimately denied the renewal of Mr. Hargett's Plavix prescription.  Mr. Hargett points to Dr. Mitcheff's general testimony that "RMD" refers to Regional Medical Director, which was his position.  [Filing No. 165-19 at 3.]  But Defendants contend that the June 22, 2009 emails discussing Mr. Hargett's Plavix prescription indicate that Dr. Person made the decision to switch him from Plavix to aspirin "on behalf of RMD Review."  [Filing No. 168 at 6 (referencing Filing No. 169-1 at 1-2).]

On August 15, 2009, Mr. Hargett submitted a Request for Health Care form, stating, "I feel like I am running a fever.  My whole body aches, and I haven't really been able to hold anything down for a couple of days.  I AM A CHRONIC CARE HEART PATIENT and have had

open heart surgery." [Filing No. 152-8 at 5 (original emphasis).] He was triaged the following day. [Filing No. 152-8 at 5.] On August 17, 2009, Mr. Hargett submitted another Request for Health Care form, stating that he was having chest pain. [Filing No. 152-8 at 6.] Mr. Hargett was seen that day and referred to a physician for follow up. [Filing No. 152-8 at 6-7.] The treatment notes indicate that Mr. Hargett's 81 mg aspirin/Ecotrin prescription was approved through January 1, 2010. [Filing No. 152-8 at 9.]

On August 18, 2009, Dr. Charles Zimont examined Mr. Hargett. [Filing No. 152-8 at 9-12.] Dr. Zimont noted that Mr. Hargett had experienced flu like symptoms for five days, a "recent blur" in his left eye, that he had glasses but was not wearing them, that he did not have a fever, and that he did have chest pain. [Filing No. 152-8 at 9-10.] Dr. Zimont diagnosed Mr. Hargett with heat exhaustion and instructed him to follow up if the condition worsened or did not improve within seven days. [Filing No. 152-8 at 11-12.] The treatment notes again indicate that Mr. Hargett's 81 mg daily aspirin/Ecotrin prescription was approved through January 1, 2010. [Filing No. 152-8 at 11.]

On August 21, 2009, Mr. Hargett submitted a Request for Health Care form, stating, "I am having a lot of trouble with my vision. It's been almost a week and seems to be getting worse." [Filing No. 152-8 at 13.] An appointment was scheduled for August 22, 2009, but Mr. Hargett was did not show up for it because he stayed in his cell to sleep. [Filing No. 152-8 at 12-13.]

At approximately 4:30 p.m. on August 22, 2009, Mr. Hargett was found unresponsive in his dorm. [Filing No. 152-8 at 15-17.] Urgent care noted that Mr. Hargett's temperature was 98.1, his chest area was "hot to touch," and his pupils were sluggish. [Filing No. 152-8 at 16.]

Mr. Hargett was transferred to SVHA via ambulance and 911 per Dr. Mitcheff's orders. [Filing No. 152-8 at 16.]

Mr. Hargett was examined at SVHA, where he was awake but nonverbal. [Filing No. 152-34 at 24.] Mr. Hargett was stabilized and transferred to WMH on August 23, 2009, [Filing No. 152-36 at 4; Filing No. 152-15 at 6], and he remained there until he was discharged on September 2, 2009, [Filing No. 152-15 at 6]. During his hospitalization, WMH physicians determined that Mr. Hargett had endocarditis, specifically a "[m]ass on the ventricular aspect of the aortic valve consistent with known endocarditis." [Filing No. 152-15 at 6.] They concluded that he had suffered an embolic stroke because of vegetation on the aortic valve caused by the endocarditis. [Filing No. 152-15 at 6-7.] Mr. Hargett was prescribed antibiotics. [Filing No. 152-15 at 7.] Mr. Hargett was ultimately discharged back to the Plainfield Correctional Facility with a prescription for, among other medications, 325 mg of aspirin daily. [Filing No. 152-15 at 8-9.] Mr. Hargett's discharge medications do not list Plavix or its generic name, Clopidogrel. [Filing No. 152-15 at 8-9.]

According to Dr. Mitcheff, bacterial endocarditis is an infection of the aortic valve or cardiac tissue. [Filing No. 152-2 at 7.] A cluster of bacterial cells is referred to as vegetation, which may break off and cause a stroke. [Filing No. 152-2 at 7.] It is undisputed that the type of stroke Mr. Hargett had (an embolic stroke) is not the type of stroke that Plavix prevents (a thrombotic stroke). [See Filing No. 161 at 4.] Mr. Hargett's own expert, Dr. Lucinda Dunaway, testified that even if Mr. Hargett had been on Plavix, it would not have shrunk the size of the large vegetation found on his aortic valve and would not have reduced the risk of an embolic stroke like Mr. Hargett had. [Filing No. 165-30 at 16.] Dr. Dunaway further testified that none of Mr. Hargett's medications caused his endocarditis and that none of them would have prevent-

ed it.  [Filing No. 165-30 at 18 (after discussing Mr. Hargett's medications, including Plavix, "Q: Would [the medications] have prevented this type of a stroke, an embolic event?  A. No.").]  Because Mr. Hargett does not dispute that the lack of Plavix did not cause his stroke, his theory of liability is that "by taking Mr. Hargett off Plavix and placing him on aspirin, [Defendants] caused the GERD."  [Filing No. 161 at 2.]  Thus, Mr. Hargett argues that Defendants cannot rely on Mr. Hargett's GERD to "justif[y] their disregard of his emerging stroke symptoms."  [Filing No. 161 at 4.]

### B. Post-Stroke Care

On September 2, 2009, Mr. Hargett entered the Plainfield Correctional Facility Infirmary. [Filing No. 152-8 at 18; Filing No. 152-8 at 22.]  Nurse Toni R. Jordan noted that he was awake, alert, and could nod yes and no to questions.  [Filing No. 152-8 at 22.]  Mr. Hargett's right arm and leg were flaccid, and his tongue deviated to the right.  [Filing No. 152-8 at 22.]  An egg crate mattress was placed on his bed and a sitter was positioned at his bedside.  [Filing No. 152-8 at 22.]  Mr. Hargett also experienced aphasia.  [Filing No. 152-8 at 24.]  The medication notes indicate that Mr. Hargett was taking 325 mg of aspirin daily.  [Filing No. 152-8 at 23 (listing 325 mg of Ecotrin started on September 2, 2009, replacing 81 mg of Ecotrin stopped on September 2, 2009).]

On September 9, 2009, Mr. Hargett had his first physical therapy session.  [Filing No. 152-12 at 9.]  Mr. Hargett was able to stand with moderate assistance, but he was unable to take any steps.  [Filing No. 152-12 at 9-10.]  Mr. Hargett received education about exercises for his right extrimities.  [Filing No. 152-12 at 10.]

On September 14, 2009, Mr. Hargett was transferred to WMH after several episodes of vomiting.  [Filing No. 152-9 at 11; Filing No. 152-15 at 4.]  Mr. Hargett was diagnosed with a

splenic infarction, "which likely is secondary to bacterial endocarditis." [Filing No. 152-15 at 5.]
He was also diagnosed with gastrointestinal bleeding. [Filing No. 152-15 at 2.] Mr. Hargett was
discharged on September 25, 2009, with orders to remain on antibiotics but to discontinue the
325 mg aspirin "due to concern for hemorrhagic conversion of [unintelligible] stroke." [Filing
No. 152-15 at 1; Filing No. 152-15 at 3.] Mr. Hargett's discharge medications do not list aspirin,
Ecotrin, Plavix, or Clopidogrel. [Filing No. 152-15 at 3-4.]

     Mr. Hargett returned to WMH on September 28, 2009, for a follow up. [Filing No. 152-
18 at 15.] Mr. Hargett was told to continue the antibiotics until October 5, 2009, and return in
one month for a follow-up appointment. [Filing No. 152-18 at 15-17.] Mr. Hargett followed up
on October 26, 2009. [Filing No. 152-18 at 17.]

     On September 30, 2009, Mr. Hargett had his second physical therapy session. [Filing
No. 152-12 at 12.] The therapist noted that Mr. Hargett still had difficulty with expressive apha-
sia and right side flaccidity. [Filing No. 152-12 at 12.] Mr. Hargett was educated on mobility
and advised to be out of bed at least six hours per day. [Filing No. 152-12 at 12.] Mr. Hargett
was ordered to follow up the following week. [Filing No. 152-12 at 12.] The treatment notes do
not list aspirin, Ecotrin, Plavix, or Clopidogrel as Mr. Hargett's medications. [Filing No. 152-12
at 12-13.]

     Mr. Hargett had physical therapy sessions on sixteen more occasions between October
2009 and April 2010. [Filing No. 152-12 at 14-25; Filing No. 152-13 at 1-25; Filing No. 152-14
at 1-3.] Mr. Hargett became able to say certain words, [Filing No. 152-9 at 25], and walk with a
gait belt, [Filing No. 152-10 at 23]. On March 11, 2010, Mr. Hargett had a neurology follow-up
at WMH. [Filing No. 152-19 at 7.] At that time it was recommended that he receive aspirin or

Plavix. [Filing No. 152-19 at 7.] Mr. Hargett's DOC treatment notes indicate that his daily pre-scription for 75 mg of Plavix resumed on February 2, 2010. [Filing No. 152-13 at 14-15.]

At his last physical therapy session on April 21, 2010, Mr. Hargett reported that his right shoulder was sore, but that the pain had decreased from previous visits. [Filing No. 152-14 at 2.] Mr. Hargett utilized a hand/wrist splint and sling to support his right arm. [Filing No. 152-14 at 2.] The therapist noted that that he had progressed with improved passive range of motion exer-cises and a decrease in pain. [Filing No. 152-14 at 2.] Mr. Hargett was discharged from physical therapy at that time. [Filing No. 152-14 at 2.]

Mr. Hargett attended speech therapy at WMH from May 2010 until August 2010. [Filing No. 152-19 at 8-20.] Mr. Hargett refused to attend certain sessions, and he was ultimately dis-charged from speech therapy services "due to lack of compliance with attendance policy." [Filing No. 152-19 at 10.]

Mr. Hargett was discharged from the DOC on August 27, 2010. [Filing No. 151 at 13; Filing No. 1-8 at 4.]

## C. Relevant Procedural History

On August 22, 2011, Mr. Hargett filed a state court action against various defendants, in-cluding CMS and Dr. Mitcheff. [Filing No. 1-8.] Defendants removed the case to this Court, and the operative complaint was filed on June 1, 2012. [Filing No. 61.]

Defendants moved for summary judgment on Mr. Hargett's claims on December 31, 2013. [Filing No. 150.] Mr. Hargett opposes Defendants' motion. [Filing No. 161.] Mr. Har-gett also filed a Motion to Strike the Affidavit of Carrie Welder that Defendants filed in support of their summary judgment motion. [Filing No. 167 (requesting that the Court strike dkt. 152-

31).] Defendants have asked the Court to strike or limit the testimony of Mr. Hargett's experts. [Filing No. 158.] These motions are now fully briefed.

### III.
#### DISCUSSION

Defendants move for summary judgment on Mr. Hargett's claims against them. [Filing No. 150.] In response, Mr. Hargett clarifies that he is pursuing three legal claims against the remaining Defendants—1) a negligence claim against CMS; 2) a 42 U.S.C. § 1983 claim against CMS; and 3) a 42 U.S.C. § 1983 claim against Dr. Mitcheff. [Filing No. 161 at 1.] Mr. Hargett disputes Defendants' characterization of the underlying factual basis for claims, [Filing No. 161 at 2 ("The facts upon which Plaintiff[] supports its claims cannot be so limited or parsed.")], but never clearly sets forth what he believes is the proper underlying factual basis or directs the Court to record evidence to support his version as required by Federal Rule 56(c). After reviewing Mr. Hargett's response, the Court has discerned that his claims appear to be based on four categories of alleged action or inaction by the Defendants—1) failing to renew Mr. Hargett's Plavix prescription, which Mr. Hargett contends caused GERD and masked his stroke symptoms; 2) failing to keep the scheduled August 17, 2009 WMH cardiology appointment; 3) failing to have a treatment plan for Mr. Hargett pursuant to the Health Care Services Directives ("HCSD"); and 4) the alleged inadequacy of Mr. Hargett's post-stroke treatment.

The disjointed nature of Mr. Hargett's response brief has hampered the Court's review of the pending summary judgment motion. Mr. Hargett's brief begins with a nine-page "introduction," which appears to be his version of the relevant facts interspersed with argument. [Filing No. 161 at 1-9.] He then specifies the material facts he believes to be in dispute, [Filing No. 161 at 10-13], followed by an eight-page section describing why he believes that Dr. Mitcheff's testimony is unreliable, [Filing No. 161 at 13-20]. Mr. Hargett's argument section does little to tie

his factual allegations to specific legal claims he is asserting. For example, the first nine pages contain no header other than "Argument," leaving the Court to guess what legal claim is being addressed. [Filing No. 161 at 20-28.] That section is followed by a five-page "Deliberate Indifference" section that does not distinguish between the two § 1983 claims Mr. Hargett is pursuing—one against Dr. Mitcheff and one against CMS—or clearly list his theories of liability for each of those defendants. [Filing No. 161 at 28-32.] Finally, Mr. Hargett has a six-page "Lost Chance" section that focuses on various wrongs he believes he suffered, but does not expressly state at which claim or defendant the arguments therein are directed. [Filing No. 161 at 32-38.]

In sum, Mr. Hargett never clearly identifies the underlying factual bases for his claims and fails to tie any factual bases to his three specific legal claims. This has dramatically complicated the Court's review of the pending summary judgment motion. The Court has done its best to address the issues raised on summary judgment, but any failure to do so is because that issue was not fully developed and, thus, waived. *See Anderson v. Gutschenritter*, 836 F.2d 346, 349 (7th Cir. 1988) (noting that "an issue expressly presented for resolution is waived if not developed by argument"); *see also Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995) ("[J]ust as a district court is not required to scour the record looking for factual disputes, it is not required to scour the party's various submissions to piece together appropriate arguments. A court need not make the lawyer's case.").

### A. 42 U.S.C. § 1983 Claims

Mr. Hargett is pursuing § 1983 claims against both Dr. Mitcheff and CMS. [Filing No. 161 at 1.] The legal standards for a § 1983 claim against a medical official such as Dr. Mitcheff are different from the legal standards for a § 1983 claim against a company like CMS, as will be further addressed below. Mr. Hargett ignores the different standards. The Court has tried to give

Mr. Hargett the benefit of the doubt when addressing these claims, but again, to the extent it has failed to address an argument Mr. Hargett intended to raise, it is because Mr. Hargett did not cogently develop it.

    1)  <u>Dr. Mitcheff</u>

        *a.  Applicable Law*

The Eighth Amendment's ban on "cruel and unusual punishments" requires prison officials to take reasonable measures to guarantee the safety of inmates, including the provision of adequate medical care. *Minix v. Canarecci*, 597 F.3d 824, 830 (7th Cir. 2010). A cause of action may be brought under 42 U.S.C. § 1983 against "[e]very person who, under color of statute, ordinance, regulation, custom or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."

To sustain a § 1983 claim for violation of the right to adequate medical care, a plaintiff must show that: (1) he had an objectively serious medical condition; (2) the defendants knew of the condition and were deliberately indifferent to treating him; and (3) this indifference caused him some injury. *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). With regard to the deliberate indifference element, the plaintiff must show that the official "acted with the requisite culpable state of mind." *Id.* This inquiry has two components—(1) the official must have subjective knowledge of the risk to the inmate's health, and (2) the official also must disregard that risk. *Id.* Simply put, an official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* Even if a defendant recognizes the substantial risk, he is free from liability if he "responded reasonably to the risk, even if the harm ultimately was not averted." *Id.*

"A difference of opinion as to how a condition should be treated does not give rise to a constitutional violation." *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001). Negligence or even gross negligence does not constitute deliberate indifference. *Perkins v. Lawson*, 312 F.3d 872, 875 (7th Cir. 2002). To survive summary judgment, a plaintiff claiming a violation of § 1983 must produce evidence that the defendant "caused or participated in [the] constitutional deprivation." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). Plaintiff may not rely on the doctrine of respondeat superior but must instead allege personal involvement in the wrongdoing. *Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001). A medical director sued under § 1983 "cannot be liable absent personal involvement." *Smith v. Rohana*, 433 F. App'x 466, 469 (7th Cir. 2011). Instead, "[t]here must be a causal connection or affirmative link between the action complained about and the official sued." *Arnett v. Webster*, 658 F.3d 742, 759 (7th Cir. 2011).

### b. Denial of Plavix Prescription

It appears that Mr. Hargett's main theory of liability for the § 1983 claim against Dr. Mitcheff is that when Mr. Hargett was taken off Plavix and kept on aspirin, the "[a]spirin cause[d] GERD, which masked [Mr. Hargett's] stroke symptoms."[7] [Filing No. 161 at 2-5.]

---

[7] Mr. Hargett repeatedly criticizes Defendants for "plac[ing] him on a medication [aspirin] that actually caused him to become ill, which medication he could not tolerate" shortly before he suffered the stroke. [*See, e.g.,* Filing No. 161 at 36.] This argument ignores that the same June 2009 WMH discharge order that Mr. Hargett cites for his aspirin intolerance also directs the prison to continue to dispense 81 mg of aspirin daily. [Filing No. 165-1 at 4 (discharge orders listing second medication as "Aspirin, 81 mg PO daily, Quantity: Prison to dispense and supply meds").] The undisputed evidence shows that Mr. Hargett was kept on 81 mg of aspirin daily, consistent with that order, until he suffered the stroke on August 22, 2009. [Filing No. 152-7 at 25; Filing No. 152-8 at 1; Filing No. 152-8 at 9 (indicating that Mr. Hargett's 81 mg daily aspirin prescription renewed through January 1, 2010).] After the stroke, Mr. Hargett was temporarily placed on 325 mg of aspirin daily. [Filing No. 152-8 at 23 (post-stroke record listing 325 mg of Ecotrin started on September 2, 2009, replacing 81 mg of Ecotrin stopped on September 2, 2009).]

- 17 -

Specifically, Mr. Hargett contends that Dr. Mitcheff was personally involved in denying Mr. Hargett's Plavix prescription, which caused Mr. Hargett's GERD and allegedly resulted in the treating physician, Dr. Zimont, misdiagnosing Mr. Hargett's stroke symptoms. [Filing No. 161 at 4-5 ("There is no question that Dr. Mitcheff took Mr. Hargett off Plavix. . . . Aspirin causes GERD, which masked the stroke symptoms.").]

The parties dispute whether Dr. Mitcheff was personally involved in Mr. Hargett's medical care, specifically the decision to remove Mr. Hargett from Plavix. [Filing No. 151 at 16-22; Filing No. 161 at 4.] Mr. Hargett points to evidence in the record that he contends shows that Dr. Mitcheff made the decision to take Mr. Hargett off the Plavix. [Filing No. 161 at 4 ("There is no question that Dr. Mitcheff took Mr. Hargett off Plavix.") (citing Filing No. 165-3 at 1 ("Meds have been renewed. RMD did not approve the Plavix was started on aspirin regimen.")).] Defendants contend that emails from June 2009 discussing Mr. Hargett's Plavix prescription indicate that another doctor, Dr. Person, made the decision to take Mr. Hargett off aspirin "on behalf of RMD Review." [Filing No. 168 at 6 (referencing Filing No. 169-1 at 1-2).] Thus, Defendants argue that Dr. Mitcheff was not personally involved in the decision and cannot be liable under § 1983.

The Court concludes that an issue of material fact exists regarding whether Dr. Mitcheff was personally involved in the decision to take Mr. Hargett off the Plavix. Although the Court agrees with Defendants that the June 2009 emails discussing Mr. Hargett's Plavix prescription are from Dr. Person "on behalf of RMD Review," [Filing No. 169-1 at 1-2], on summary judgment the Court cannot ignore the August 2009 note in Mr. Hargett's medical chart that "RMD did not approve the Plavix[,]" [Filing No. 165-3 at 1]. Dr. Mitcheff testified that "RMD" refers to Regional Medical Director, which was his position. [Filing No. 165-19 at 3.] At this stage in

the litigation, making all reasonable inferences in favor of Mr. Hargett as the Court is required to do, the Court concludes that an issue of material fact exists regarding Dr. Mitcheff's personal involvement in the denial of Mr. Hargett's Plavix prescription.

But even if Dr. Mitcheff was personally involved in denying Mr. Hargett's Plavix prescription, the Court concludes that Mr. Hargett's Plavix-based § 1983 claim against Dr. Mitcheff still fails on summary judgment. Defendants argue that there is no evidence that GERD masked Mr. Hargett's stroke symptoms. [Filing No. 168 at 16.] The Court agrees. Because Mr. Hargett concedes that removing him from the Plavix did not cause his embolic stroke, [*see, e.g.*, Filing No. 163 at 8; Filing No. 161 at 4], he emphasizes throughout his brief that his theory of liability is that Dr. Mitcheff removed Mr. Hargett from the Plavix, which caused Mr. Hargett to experience GERD symptoms and masked his stroke symptoms. [Filing No. 161 at 4-5.] But this theory fails because the undisputed evidence shows that Mr. Hargett's stroke symptoms were not attributed to GERD. As Defendants point out, [Filing No. 168 at 16], Dr. Zimont diagnosed Mr. Hargett with heat exhaustion four days before he had the stroke, not GERD, [Filing No. 152-8 at 11-12]. In fact, that treatment record reveals no mention of Mr. Hargett's previous GERD diagnoses, even under the "Chronic Problems" section. [Filing No. 152-8 at 9.] Thus, even assuming that Dr. Mitcheff was personally involved in removing Mr. Hargett from Plavix and that decision caused Mr. Hargett to experience GERD, there is absolutely no evidence that Dr. Zimont relied on Mr. Hargett's GERD in treating him four days before the stroke. In other words, there is no evidence that the decision to take Mr. Hargett off Plavix caused Dr. Zimont to mistake Mr. Hargett's symptoms for GERD, thus affecting Dr. Zimont's treatment of Mr. Hargett. Instead, the undisputed evidence is that Dr. Zimont diagnosed Mr. Hargett with heat exhaustion and

treated him accordingly. [Filing No. 152-8 at 11 (diagnosing Mr. Hargett with "[h]eat exhaustion, unspecified").]

For these reasons, Dr. Mitcheff is entitled to summary judgment on Mr. Hargett's § 1983 claim regarding the decision to discontinue Mr. Hargett's Plavix. *See Delapaz*, 634 F.3d at 899 (holding that "[t]o survive summary judgment, a plaintiff claiming a violation of § 1983 *must produce evidence* that the defendant caused or participated in the constitutional deprivation") (emphasis added); *see also Arnett*, 658 F.3d at 759 ("There must be a causal connection or affirmative link between the action complained about and the official sued.").

### c. Treatment Plan

Mr. Hargett alleges that Dr. Mitcheff was "responsible for policies and procedures with respect to the Indiana Department of Corrections." [Filing No. 161 at 7.] Mr. Hargett further alleges that he did not have a treatment plan as allegedly required by HCSD policies. [Filing No. 161 at 18.] Thus, it appears that part of Mr. Hargett's § 1983 claim against Dr. Mitcheff may be based on the failure to have a treatment plan for Mr. Hargett. The only evidence Mr. Hargett cites to support Dr. Mitcheff's personal involvement on this point is Dr. Mitcheff's general testimony that he was contracted to provide "policy and procedure related to the Department of Correction." [Filing No. 161 at 7 (citing Filing No. 165-18 at 4).]

The Court was unable to find a copy of the HCSD policies at issue in the designated evidence. Mr. Hargett cites "response 9" of Dr. Mitcheff's response to a request for production in support of his argument, [Filing No. 161 at 7], but no policy is attached to that response, [Filing No. 165-15 at 3 (response 9 noting that the "Health Care Service Directives' Table of Contents is attached. Defendant will provide copies of specific chapters at Plaintiff's request" with no attachment in designation)]. Mr. Hargett quotes portions of the policy in his brief, [Filing No. 161

at 7-9], but his brief is not evidence and the ellipses indicate that certain portions have been omit-

ted. *See Medallion Products, Inc. v. McAlister*, 2008 WL 4542997, *2 (N.D. Ill. 2008) (criticiz-

ing plaintiff's failure to cite evidence for certain factual statements because "[a]rguments in a

brief, unsupported by documentary evidence, are not evidence"). Summary judgment "is the put

up or shut up moment in a lawsuit, when a party must show what evidence it has that would con-

vince a trier of fact to accept its version of events." *Johnson*, 325 F.3d at 901. Mr. Hargett's

failure to designate the policies at issue in this claim entitles Dr. Mitcheff to summary judgment

on any claim Mr. Hargett is making regarding the policies.

Even assuming for the sake of the argument that the HCSD policies required a treatment

plan, that Dr. Mitcheff was generally responsible for those policies,[8] and that Mr. Hargett did not

have a treatment plan as required,[9] Mr. Hargett's treatment-plan-based § 1983 claim still does

not survive summary judgment. There is no evidence that Dr. Mitcheff was personally responsi-

ble for actually drafting Mr. Hargett's treatment plan or that he was aware that a treatment plan

did not exist. As noted, liability under § 1983 requires personal involvement, and Mr. Hargett

only alleges that Dr. Mitcheff was responsible for the general policies, not that he was personally

responsible for actually drafting a treatment plan for Mr. Hargett pursuant to the policy. *See

Garvin*, 236 F.3d at 898-99 ("As we repeatedly say, a supervisor cannot be held vicariously lia-

---

[8] Dr. Mitcheff attests that he is "not responsible for the preparation of [CMS's] policies; this is the responsibility of the Medical Director." [Filing No. 152-2 at 2.] Even if the Court discredits this and only looks to his deposition testimony—that he was generally contracted to provide "policy and procedure," [Filing No. 165-18 at 4]—Mr. Hargett's argument makes an unsupported leap to the assertion that Dr. Mitcheff was specifically responsible for the HCSD policy. Mr. Hargett does not direct the Court to any testimony regarding the HCSD policy or Dr. Mitcheff's involvement in drafting, implementing, or following it.

[9] In their reply brief, Defendants cite Dr. Dunaway—Mr. Hargett's expert—in support of their argument that discharge summaries at the end of Mr. Hargett's medical appointments could con- stitute treatment plans. [Filing No. 168 at 13-14.] The Court need not address this argument, considering that Mr. Hargett's claim fails even if he did not have a treatment plan.

ble for the actions of others."). Moreover, there is no evidence that Dr. Mitcheff was aware that a treatment plan for Mr. Hargett did not exist. Deliberate indifference requires that the official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Gayton*, 593 F.3d at 620.

Even making all reasonable inferences in favor of Mr. Hargett, Dr. Mitcheff is entitled to summary judgment on the portion of Mr. Hargett's § 1983 claim asserting liability for the failure to have a treatment plan. *See, e.g.*, *Minix*, 597 F.3d at 834 (affirming summary judgment to medical director where no evidence of direct participation and no evidence he was aware subordinates were performing incompetently and acquiesced in that practice, concluding that "[w]ithout knowledge of the allegedly unconstitutional care that [a subordinate] provided, [the medical director] cannot be liable by mere virtue of his supervisory status").

### d. Conclusion Regarding Dr. Mitcheff

The Court has already concluded that Dr. Mitcheff is entitled to summary judgment on Mr. Hargett's § 1983 claim, to the extent it is based on any decision to refuse renewal of Mr. Hargett's Plavix prescription or the failure to have a treatment plan. As for Mr. Hargett's other two theories of liability—the failure to attend the August 17, 2009 cardiology appointment and the alleged inadequacy of his post-stroke care—the Court concludes that Mr. Hargett either is not pursuing those theories against Dr. Mitcheff under § 1983 or did not adequately develop them.

Mr. Hargett does not allege that Dr. Mitcheff was personally responsible for Mr. Hargett not attending the August 17, 2009 cardiology appointment. He acknowledges that although Dr. Mitcheff was responsible for the initial cardiologist referral, his claim regarding the appointment is "not a failure to schedule the appointment." [Filing No. 161 at 6-7; *see also* Filing No. 152-8 at 2-4 (multiple faxes between June 24, 2009 and July 6, 2009 to WMH requesting a cardiology

appointment for Mr. Hargett); Filing No. 152-8 at 4 (noting that WMH scheduled cardiology appointment for Mr. Hargett for August 17, 2009).]  Therefore, any § 1983 claim against Dr. Mitcheff based on the missed appointment would fail, since there is no allegation or evidence that Dr. Mitcheff was personally involved in Mr. Hargett not attending the appointment.  *Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 797 (7th Cir. 2014) (holding in the context of a mistaken referral that "[t]here is no indication that [the defendant doctors] had any involvement in that mistaken referral, let alone that either one acted with deliberate indifference to [the prisoner plaintiff's] health in allowing the referral to go forward").

Likewise, Mr. Hargett does not develop any argument that Dr. Mitcheff was personally responsible for the alleged inadequacy of his post-stroke therapy.  He alleges that Dr. Mitcheff had to approve therapy sessions as part of his job, [Filing No. 161 at 15-16], but there is no allegation or evidence that Dr. Mitcheff ever denied a therapy session or did not follow protocol in approving those sessions.  Without evidence of Dr. Mitcheff's direct participation in alleged constitutional violations, Dr. Mitcheff "cannot be liable by mere virtue of his supervisory status." *Minix*, 597 F.3d at 834.

For these reasons, the Court concludes that Dr. Mitcheff is entitled to summary judgment on the entirety of Mr. Hargett's § 1983 claim against Dr. Mitcheff.  [Filing No. 161 at 1.]

2)  CMS

a.  *Applicable law*

CMS is a company that contracts with the DOC to provide medical care to various prisons throughout Indiana.  [Filing No. 152-2 at 2.]  CMS is "treated the same as a municipality for liability purposes under § 1983."  *See Minix*, 597 F.3d at 832 (a corporation that contracted with a jail to provide health services is "treated the same as municipalities for liability purposes in a §

- 23 -

1983 action"). It may be liable for harm to persons incarcerated "if it maintains a policy that sanctions the maintenance of prison conditions that infringe upon the constitutional rights of the prisoners." *Id.* The "policy or practice must be the direct cause or moving force behind the constitutional violation, which a plaintiff may show directly by demonstrating that the policy itself is unconstitutional." *Id.* "If a plaintiff cannot identify any formal policy that is unconstitutional, the plaintiff may show deliberate indifference through a series of bad acts creating an inference that municipal officials were aware of and condoned the misconduct of their employees." *Id.*

"It is well-established that there is no respondeat superior liability under § 1983." *Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760, 766 (7th Cir. 2002). A "private corporation is not vicariously liable under § 1983 for its employees' deprivations of others' civil rights." *Id.* In general terms, to maintain a viable § 1983 action against a municipality or similar entity, a plaintiff must demonstrate that a constitutional deprivation occurred as the result of an express policy or custom of the government unit. *Id.* (citing *Latuszkin v. City of Chicago*, 250 F.3d 502, 504 (7th Cir. 2001)).

### b. *Mr. Hargett's Policy Claims*

CMS argues that Mr. Hargett has failed to establish that it had an unconstitutional policy or widespread custom of denying access to adequate medical care. [Filing No. 151 at 27-29.] CMS contends that Mr. Hargett received regular chronic care visits at least every 90 days, was regularly sent to WMH for cardiology appointments, was sent to hospitals at least six times before his stroke for emergency treatment, and was prescribed and given various medications. [Filing No. 151 at 28-29.]

Mr. Hargett does not argue that a specific policy that CMS enforced is unconstitutional.[10] Instead, Mr. Hargett's § 1983 claim against CMS is that "the cumulative activity of the Defendants establishes a custom or policy and deliberate indifference." [Filing No. 161 at 28.] Mr. Hargett claims that he "intends to show that there was a general environment of neglect." [Filing No. 161 at 29.] He then argues, without further elaboration, that there "were indeed systemic deficiencies and procedures which made unnecessary suffering inevitable." [Filing No. 161 at 29.] He contends there was "a pattern of negligent acts and systemic and gross deficiencies in the procedures." [Filing No. 161 at 29.] He points to alleged deficiencies in his own medical care to support his claim. [Filing No. 161 at 29-32.]

Mr. Hargett's attempt to rely on alleged deficiencies in his own medical care to establish an unconstitutional general policy or widespread practice is insufficient to create an issue of material fact for purposes of summary judgment. See Palmer v. Marion County, 327 F.3d 588, 597 (7th Cir. 2003) ("a showing of isolated incidents does not create a genuine issue as to whether defendants have a general policy or a widespread practice of an unconstitutional nature"). In Palmer, the Seventh Circuit detailed various discovery requests the plaintiff could have made to seek "raw data" to create a genuine issue of material fact as to whether the defendant had a general policy or a widespread practice of an unconstitutional nature. Id. Because the plaintiff in Palmer did not do that, the Seventh Circuit held that he could not create an issue of material fact by only pointing to his own circumstances. Id. A plaintiff's own circumstances "demonstrate

---

[10] Again, as best the Court can discern, Mr. Hargett's claims in this case are based on four categories of action or inaction—1) failing to renew Mr. Hargett's Plavix prescription, which allegedly caused GERD and masked his stroke symptoms; 2) failing to keep the scheduled August 17, 2009 WMH cardiology appointment; 3) failing to have a treatment plan for Mr. Hargett pursuant to the HCSD Guidelines; and 4) the alleged inadequacy of Mr. Hargett's post-stroke treatment. None of these assert an unconstitutional policy. Although the third category involves a policy, Mr. Hargett's argument is that the policy at issue was not followed, not that the policy itself was unconstitutional.

nothing more than isolated incidents," which do "not create a genuine issue as to whether defendants have a general policy or a widespread practice of an unconstitutional nature." *Id.*

Because Mr. Hargett has done nothing more than point to his own circumstances, he has failed to create a genuine issue of material fact as to whether CMS had a general policy or a widespread practice of an unconstitutional nature. While he argues that he "intends to show that there was a general environment of neglect," [Filing No. 161 at 29], summary judgment is the moment where a party must show what evidence it has that would convince a trier of fact to accept its version of events, *Johnson, 325 F.3d at 901*. Mr. Hargett has failed to present such evidence. For that reason, the Court grants summary judgment in favor of CMS on Mr. Hargett's § 1983 claim.

### B. Negligence Claim against CMS

Mr. Hargett asserts a negligence claim against CMS. [Filing No. 161 at 1.] CMS moves for summary judgment on Mr. Hargett's negligence claim, alleging that it is not vicariously liable for the alleged negligence of Dr. Mitcheff, Dr. Zimont, or Dr. Mihalo. [Filing No. 151 at 14-24.] The Court will address the parties' respective arguments pertaining to each doctor below.

Because Indiana law applies to this state-law claim, the Court must attempt to predict how the Indiana Supreme Court would decide the state legal questions at issue. *Mindgames, Inc. v. W. Publ'g Co., 218 F.3d 652, 655-56 (7th Cir. 2000)*. This Court will not expand the scope of state law beyond its current bounds. *Estate of Moreland v. Dieter, 576 F.3d 691, 700 (7th Cir. 2009)*.

1) Dr. Mitcheff

Mr. Hargett attempts to impute Dr. Mitcheff's alleged negligence to CMS, Dr. Mitcheff's employer.[11] [Filing No. 168 at 7.] Defendants argue that Mr. Hargett has not designated the necessary expert testimony to establish that Dr. Mitcheff was negligent. [Filing No. 151 at 15-16; Filing No. 168 at 7.]

A plaintiff seeking damages for negligence must establish (1) a duty owed to the plaintiff by the defendant, (2) a breach of the duty, and (3) an injury proximately caused by the breach of duty. *Kader v. State, Dep't of Correction*, 1 N.E.3d 717 (Ind. Ct. App. 2013). "When there is no genuine issue of material fact and any one of these elements is clearly absent, summary judgment is appropriate." *Id.*

Under Indiana law, "expert medical testimony is usually required to determine whether a physician's conduct fell below the applicable standard of care." *Bader v. Johnson*, 732 N.E.2d 1212, 1217-18 (Ind. 2000); *see also Musser v. Gentiva Health Servs.*, 356 F.3d 751, 753 (7th Cir. 2004) ("[U]nder Indiana law a prima facie case in medical malpractice cannot be established without expert medical testimony."). "This is generally so because the technical and complicated nature of medical treatment makes it impossible for a trier of fact to apply the standard of care

---

[11] "Respondeat superior liability exists in Indiana tort law." *Perkins v. Lawson*, 312 F.3d 872, 876 (7th Cir. 2002). It "creates liability for a principal where it would otherwise not exist." *Id.* Thus, although medical malpractice claims are not pending in this case because they are before the Indiana Department of Insurance, [dkt. 161 at 1], Mr. Hargett relies on Dr. Mitcheff's alleged negligence to impute liability to CMS. Defendants do not dispute that as a general matter, CMS could be liable for Dr. Mitcheff's alleged negligence. [Filing No. 168 at 7.]

without the benefit of expert opinion on the ultimate question of breach of duty." [12]   *Bader*, 732 N.E.2d at 1217-18.

In support of their summary judgment motion, Defendants designate an affidavit from their expert, Dr. Hermiller, detailing the relevant medical treatment provided to Mr. Hargett, concluding that the treatment was appropriate and met the applicable standard of care.  [Filing No. 152-29.]  Additionally, Defendants submit an affidavit from Dr. Mitcheff opining that he complied with the applicable standard of care in approving Mr. Hargett's medications, off-site visits, and therapy requests.  [Filing No. 152-2 at 10.]  Defendants argue that Mr. Hargett must present expert testimony that Dr. Mitcheff's conduct fell below the standard of care.  [Filing No. 151 at 15-16 (citing *Marquis v. Battersby*, 443 N.E.2d 1202, 1203 (Ind. Ct. App. 1982)).]  As Defendants point out on reply, "[n]either of [Mr. Hargett's] experts have opined that Dr. Mitcheff was negligent or deliberately indifferent.  Therefore, there is no negligent action to attribute to [CMS]."  [Filing No. 168 at 7.]

The Court has already detailed the confusing and generalized nature of Mr. Hargett's response brief.  That deficiency negatively affects Mr. Hargett's negligence claim against CMS based on Dr. Mitcheff's conduct.  Mr. Hargett seems to assume that simply because Dr. Mitcheff was an employee of CMS and that Mr. Hargett believes that Dr. Mitcheff was negligent, that is enough to defeat Defendants' summary judgment motion on this claim.  [*See, e.g.*, Filing No. 161 at 26 ("[Dr. Mitcheff] is clearly an employee of CMS and CMS would be responsible for his negligence occurring in the scope of his employment.").]  But Mr. Hargett never specifies what alleged negligence he seeks to impute from Dr. Mitcheff to CMS, and he does not cite specific

---

[12] There is a "common law exception" to this rule, but it "has been limited to cases in which obvious mistakes have been made in surgery."  *Musser*, 356 F.3d at 760.  Mr. Hargett does not argue that the common law exception applies in this case, excusing him from the need to present expert testimony.

expert testimony addressing the applicable standard of care of the alleged negligence as it pertains to Dr. Mitcheff. In their opening brief, Defendants clearly point out the need for Mr. Hargett to present expert testimony supporting his negligence claim to the extent it is based on Dr. Mitcheff's conduct. [Filing No. 151 at 15-16.] Although Mr. Hargett's response brief generally cites reports from his experts, to the extent those are considered,[13] [Filing No. 158-2 (report from Dr. Dunaway); Filing No. 165-16 (report from Dr. Griffith)], neither expert report specifically opines about *Dr. Mitcheff's* alleged negligence or the applicable standard of care *as it pertains to Dr. Mitcheff*. Instead, both of Mr. Hargett's experts paint their opinions with broad brush strokes and address the alleged negligence of the Defendants collectively.

In sum, to impute Dr. Mitcheff's alleged negligence to CMS, Mr. Hargett "must present expert testimony to establish the applicable standard of care and to show whether the defendant's conduct falls below the standard of care." *Musser*, 356 F.3d at 760. Because Mr. Hargett did not do this with regard to the alleged negligence of Dr. Mitcheff, he cannot establish a necessary element of his negligence claim against CMS based on Dr. Mitcheff's conduct. *Id.* Therefore, the

---

[13] Mr. Hargett cites an unsworn expert report from Dr. Dunaway. [Filing No. 161 at 33 (referencing Filing No. 158-2).] But Dr. Dunaway's unsworn report "was introduced into the record without any supporting affidavit verifying its authenticity and is therefore inadmissible and cannot be considered for purposes of summary judgment." *Scott v. Edinburg*, 346 F.3d 752, 759 (7th Cir. 2003). Moreover, Mr. Hargett did not actually designate it on summary judgment or cite to where it could be found on the docket. The Court found it attached to Defendants' Motion to Strike or Limit Expert Testimony when reviewing that motion. [Filing No. 158-2.] The Court "need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. Pro. 56(c)(3) (emphasis added).

Court concludes that Defendants are entitled to summary judgment on Mr. Hargett's negligence claim, to the extent it is based on Dr. Mitcheff's alleged negligence.[14]

2) Drs. Zimont and Mihalo

Mr. Hargett also tries to impute the alleged negligence of Drs. Zimont and Mihalo to CMS. [Filing No. 161 at 20-28.] The parties dispute whether any negligence by those doctors can be imputed to CMS because they were not CMS employees. Mr. Hargett contends that even if Drs. Zimont and Mihalo were independent contractors, CMS can still be liable for their actions because those doctors were "*locum tenens* physicians."[15] [Filing No. 161 at 20-22.] He argues that they had apparent authority to act on behalf of CMS, [Filing No. 161 at 22-28], and that an exception to the general rule precluding respondeat superior liability applies because CMS was a principal charged with a contractual, non-delegable duty, [Filing No. 161 at 27-28].

CMS argues that Mr. Hargett has failed to provide any evidence from which a jury could determine that CMS had control over the decisions of Drs. Zimont and Mihalo. [Filing No. 168 at 8-9.] CMS further contends that apparent authority is not material because Mr. Hargett, a prisoner, did not have a choice regarding his medical care and did not accept medical treatment

---

[14] Mr. Hargett designated expert deposition testimony from Dr. Dunaway and Dr. Griffith, but he does not cite it for any expert opinion specifically concerning Dr. Mitcheff's alleged negligence. [Filing No. 161.] The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898. The Court assumes that if either of Mr. Hargett's experts specifically opined about the applicable standard of care as it pertains to Dr. Mitcheff or the specific alleged negligence Mr. Hargett sought to impute from Dr. Mitcheff to CMS, Mr. Hargett would have directed the Court to that testimony. *See Greenlaw v. United States*, 554 U.S. 237, 243-44 (2008) ("[W]e rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present .... Our adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief.").

[15] Mr. Hargett does not define this term or argue why it is significant. To the extent Mr. Hargett intended to make an argument on the basis of this purported status, it is waived.

from these doctors in reliance on an assumption they were linked to CMS.  [Filing No. 168 at 9-11.]  Finally, CMS argues that the non-delegable duty contract exception to the general rule precluding respondeat superior liability does not apply because DOC was the principal, not CMS, and there is no evidence of any contract between CMS and Drs. Zimont and Mihalo.  [Filing No. 168 at 11-12.]

Although the parties dispute whether Drs. Zimont and Mihalo are independent contractors, the material issue is actually whether their alleged negligence can be imputed to CMS.  *See Sword v. NKC Hospitals, Inc.*, 714 N.E.2d 142, 148 n.5 (Ind. 1999) (discussing general vicarious liability law and noting that "[w]hile servants and independent contractors are different in a tort context, this is not necessarily true in an agency context.  In the agency context, both a servant and an independent contractor can be an agent of the principal. . . .  In other words, while an independent contractor cannot be a servant, and vice versa, they can both be agents.").  Thus, the Court will address the parties' vicarious liability arguments with that in mind.

### a.  *Agency Arguments*

The parties extensively rely on *Sword* to support their respective agency arguments.  [Filing No. 151 at 15; Filing No. 161 at 21-27; Filing No. 168 at 9-11.]  *Sword* is a pivotal case in which the Indiana Supreme Court held for the first time that a hospital could be liable on an agency theory for the alleged medical malpractice of an independent contractor doctor.  *Id.* at 149-53 (summarizing the history of the law and how it has eroded and evolved).  At issue in *Sword* was a medical malpractice claim stemming from the alleged negligence of an independent contractor anesthesiologist who administered an epidural to the pregnant plaintiff at the defendant's hospital.  *Id.* at 145-47.

In relying on *Sword* for their respective positions regarding the agency of Drs. Zimont and Mihalo, Mr. Hargett and Defendants ignore that the Indiana Supreme Court expressly limited its holding to "the specific context of a hospital setting." *Id.* In doing so, the Indiana Supreme Court crafted a test focusing on the totality of circumstances, including the actions or inactions of the hospital, special knowledge the patient may have about the hospital's arrangements with its physicians, whether it gave notice of those arrangements to the patient, and how the hospital marketed itself. *Id.* at 152-53. While it may be possible to apply some of those factors to the relationship between CMS, Drs. Zimont and Mihalo, and Mr. Hargett, the nature of the prison medical relationship at issue in this case is fundamentally different than the medical relationship at issue in *Sword* where the hospital marketed itself a certain way and the patient chose to receive care at that hospital. *See, e.g.*, *id.* at 153 (relying in part on the hospital defendant's "extensive advertising campaign, as a full-service hospital that specializes in obstetric care" to conclude that there were issues of material fact surrounding agency). The Court cannot ignore the fundamental differences or the Indiana Supreme Court's limitation of its holding to "the specific context of a hospital setting." *Id*. at 152.

For these reasons, the Court concludes that *Sword* is inapplicable to Mr. Hargett's claim attempting to impute alleged negligence from Drs. Zimont and Mihalo to CMS. The Court's conclusion that *Sword* does not apply is further bolstered by the Indiana Supreme Court's emphasis that such claim includes an element of reliance by the plaintiff in accepting the principal doing the work itself. *714 N.E.2d at 149* (emphasizing that the agency Restatement section at issue is "captioned Negligence in Doing Work Which is Accepted *in Reliance* on the Employer's Doing the Work Himself") (original emphasis). That reliance element is at odds with the reality of prison medical care, because an inmate is not entitled to demand specific care. *Forbes v. Ed-*

*gar*, 112 F.3d 262, 267 (7th Cir. 1997) (holding that "[u]nder the Eighth Amendment, [a prisoner] is not entitled to demand specific care [and] is not entitled to the best care possible").[16]

The parties do not direct the Court to any Indiana cases supporting the notion that CMS could be held liable for the alleged negligence of Drs. Zimont and Mihalo on an agency theory in the prison medical care context. This Court will not expand the scope of state law beyond its current bounds. *Estate of Moreland*, 576 F.3d at 700. Therefore, the Court concludes that any alleged negligence of Drs. Zimont and Mihalo cannot be imputed to CMS on an apparent agency theory.

### b. *Non-Delegable Duty Exception*

Mr. Hargett argues that an exception to the general rule precluding respondeat superior liability applies because CMS was a principal charged with a contractual, non-delegable duty. [Filing No. 161 at 27-28.] Mr. Hargett contends that CMS had a contract with the DOC to provide the overall healthcare of all incarcerated patients and that "[b]ecause CMS accepted a contractual duty to provide the healthcare, it has a non-delegable duty." [Filing No. 161 at 28.]

CMS argues that in the contractual relationship at issue, DOC "is the principal which owes a non-delegable duty to provide medical care to inmates," not CMS. [Filing No. 168 at 11.] CMS also points out that there is no evidence of a contract between CMS and Drs. Mihalo and Zimont. [Filing No. 168 at 11.]

---

[16] Even if the Court tries to apply the reliance element to this case, there is no evidence of CMS's manifestations to Mr. Hargett or Mr. Hargett's beliefs regarding who was providing the medical care he was receiving at the prison. *See Sword*, 714 N.E.2d at 151 (requiring the Court to consider "the principal's manifestations" and the plaintiff's belief that the principal was providing the pertinent medical care). The affidavit of Mr. Hargett's sister regarding *her belief* that "all on site medical personnel at Plainfield Correctional Infirmary (or those medical persons treating [Mr. Hargett]) were employees of [CMS]" is not evidence of CMS's representations to Mr. Hargett during the relevant time period or of Mr. Hargett's beliefs regarding who was providing the care he received.

Under Indiana law, "the long-standing general rule has been that a principal is not liable for the negligence of an independent contractor." *Bagley v. Insight Commc'ns Co., L.P.*, 658 N.E.2d 584, 586 (Ind. 1995). There are five exceptions to this rule, including one for "where the principal is by law or contract charged with performing the specific duty." *Id.* "The five exceptions represent specific, limited situations in which the associated duties are considered non-delegable because public policy concerns militate against permitting an employer to absolve itself of all further responsibility by transferring its duties to an independent contractor." *Id.* at 588.

Prison officials are charged with a specific duty by law of providing adequate medical care to inmates. *See, e.g.*, *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (holding that the Eight Amendment imposes duties on prison officials, including to "ensure that inmates receive adequate medical care"). The only evidence that Mr. Hargett designates regarding the contractual nature of the relationship between DOC and CMS is testimony from Dr. Mitcheff providing that DOC contracted with CMS to provide "the overall healthcare of all the patients that were incarcerated in the [DOC]." [Filing No. 161 at 28 (citing Filing No. 165-21 at 3).] In the contractual relationship between DOC and CMS, DOC is the principal with the non-delegable duty. Mr. Hargett does not cite authority for an argument that DOC's non-delegable duty extended to CMS, he does not argue that public policy concerns militate against CMS making a contract with other doctors, and he does not designate evidence regarding the exact nature of any contract between CMS and Drs. Zimont and Mihalo. Thus, the Court rejects Mr. Hargett's argument that CMS is liable for any negligence of Drs. Zimont and Mihalo based on the non-delegable duty exception.

## IV.
### CONCLUSION

For the reasons set forth herein, the Court **GRANTS** summary judgment in favor of the Defendants on Mr. Hargett's remaining claims. [Filing No. 150.] Because the Court has not relied on the affidavit of Carrie Welder in ruling on summary judgment, [Filing No. 152-31], the Court **DENIES AS MOOT** Mr. Hargett's Motion to Strike that evidence, [Filing No. 167]. The Court also **DENIES AS MOOT** Defendants' Motion Objecting to Plaintiff's Experts, [Filing No. 158], because even considering Mr. Hargett's expert evidence, Defendants are still entitled to summary judgment.

Because the Court has granted summary judgment in favor of Defendants and Mr. Hargett's claims will not proceed to trial, the Court **DENIES AS MOOT** Defendants' Alternative Motion for Leave to Amend their Answer, [Filing No. 194]; Mr. Hargett's Motion to Continue the Trial, [Filing No. 212]; Mr. Hargett's Motion to Strike Defendants' Final Witness List as Non-Compliant, [Filing No. 213]; and Mr. Hargett's Motion to Strike Witness Carrie Welder and Supplemental Exhibit, [Filing No. 214].

Defendants' Motion for Attorney Fees, [Filing No. 190], remains **UNDER ADVISEMENT** and will be ruled on in a separate entry issued today. Final judgment will be issued after the Court rules on the attorney fee motion.

**Distribution via ECF only:**

James F. Bleeke
BLEEKE DILLON CRANDALL PC
jim@bleekedilloncrandall.com

Jeb Adam Crandall
BLEEKE DILLON CRANDALL PC
jeb@bleekedilloncrandall.com

Rachel A. East
BLEEKE DILLON CRANDALL, PC
rachel@bleekedilloncrandall.com

Caroline Burchett Briggs
BRIGGS LAW OFFICE
carolinebriggslawoffice@yahoo.com

Jarrod Alvin Malone
HUDDLESTON BOLEN LLP
jmalone@hallrender.com

John Kenneth Morris
MORRIS LAW FIRM
patent.lawyer@frontier.com